**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MARY BETH OHLINGER,**

  **Plaintiff,**

**v.**            **Case No.: 3:09-cv-01078**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

  **Defendant.**

## MEMORANDUM OPINION

  This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 11 and 16).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 12 and 13).

  The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

I.    **Procedural History**

Plaintiff, Mary Beth Ohlinger   (hereinafter "Claimant"), filed applications for DIB and SSI on August 17, 2005, alleging that she has been disabled since May 15, 2002 due to nerve damage in her neck and shoulder.[1] (Tr. at 135-138, 628-630, and 147). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 130-132, 126-128, 632-634, and 638-640). Thereafter, Claimant requested an administrative hearing, which was conducted on September 19, 2007 by the Honorable James S. Quinlivan, Administrative Law Judge (hereinafter "ALJ").  (Tr. at 41-76).  At the conclusion of the hearing, the ALJ ordered a psychological evaluation, stating that Claimant's last psychological evaluation was completed in 2005 and, because she was near the end of her last insured status, it was important to have a clear picture of her psychological condition to assess her DIB claim. (Tr. at 75). He notified Claimant that after she was psychologically evaluated, he would either make a decision on the record or hold a supplemental hearing. (*Id.*) The ALJ held a supplemental hearing on March 4, 2008. (Tr. at 77-116). By decision dated March 13, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-32).  The ALJ's decision became the final decision of the Commissioner on July 31, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 7-9). Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g).  (Docket No. 2). The Commissioner filed

---

[1] Claimant also testified that she had "bad hearing" in her left ear from being abused by her ex-husband (Tr. at 51); anxiety, depression, panic attacks, and problems concentrating (Tr. at 54-56); pain radiating from her neck and shoulder to her joints, elbows, wrists, and fingers, mostly on her left side, but "starting" on her right side (Tr. at 60); lower back pain that moves into her hips, knee, and ankle which she states is caused by fibromyalgia (Tr. at 61); trouble grasping with her left hand from nerve damage in her neck (Tr. at 63); and arthritis in her knees and elbows (Tr. at 64).

an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 7, 8, 11 and 16). The matter is, therefore, ripe for resolution.

## II.     Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the

claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of

the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined as a preliminary matter that Claimant last met the insured status requirements of the Social Security Act on December 31, 2007.  (Tr. at 21, Finding No. 1).   Therefore, in order to qualify for benefits, Claimant was required to establish that she was disabled on or before that date. *Stahl v. Commissioner of Social Security Administration,* 2008 WL 2565895 *4 (N.D.W.Va.), citing *Highland v. Apfel,* 149 F,3d 873 (8th Cir. 1998).

The ALJ found that Claimant satisfied the first step of the sequential evaluation, because she had not engaged in gainful activity since her alleged onset of disability, May 15, 2002. (Tr. at 21, Finding No. 2).   Although Claimant attempted to work as a waitress after the established onset date, the work activity did not rise to the level of substantial gainful activity. (*Id.*) Turning to the second

step, the ALJ determined that Claimant had severe impairments of bronchitis secondary to smoking; sinus headaches; cervical disc pathology; left shoulder tendonitis; decreased visual acuity; borderline intellectual functioning with learning disorder; depression; and anxiety with features of posttraumatic stress disorder. (Tr. at 21, Finding No. 3).  However, under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter the "Listings"). (Tr. at 22, Finding No. 4).  The ALJ assessed Claimant's residual functional capacity (hereinafter "RFC") as the following:

> [C]laimant has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). She can lift and/or carry a maximum of 20 pounds occasionally (up to 1/3 of the workday) and 10 pounds frequently (up to 2/3 of the workday). She can sit about 6 hours in an eight-hour workday, no more than 1 hour without a rest break due to neck pain. The claimant can occasionally push/pull with the upper extremity. She cannot engage in sustained or frequent overhead work. She cannot perform a job that would require her to use handheld, vibrating-type power tools. The claimant cannot climb hills or slopes or work on uneven terrain. She should not climb high ladders or work at unprotected heights. The claimant can occasionally climb stairs, steps, or ramps. She can occasionally bend, stoop, crouch, squat, or kneel. She can never balance on one leg only. The claimant cannot crawl. She should not work in the vicinity of heavy moving machinery or otherwise be exposed to excessive floor vibrations. She should not operate mobile equipment or otherwise be exposed to jars, jolts, or jostling. She cannot engage in commercial driving. The claimant cannot be exposed to excessive air pollutants, pulmonary irritants, or allergens. She should not be exposed to temperature extremes or work in damp, humid conditions. She can only occasionally perform fine fingering in the non-dominant left hand. The claimant functions at least at the limited academic or educational level. The claimant cannot perform complex tasks. She has a "mildly limited" (defined as a slight limitation in this area, but the individual can generally function well) ability to understand, remember and carry out simple instructions; to make judgment on simple work-related decisions;

and to deal with the public. She has a "moderately limited" (defined as more than a slight limitation in this area but the individual is still able to function satisfactorily) ability to understand, remember and carry out detailed instructions; to interact with supervisors and co-workers; and to respond to usual situations and changes in routine work setting.

(Tr. at 25, Finding No. 5).

As a result, the ALJ found that Claimant could not return to her past relevant employment as a certified nurse assistant, cashier/stocker, cook/dishwasher, or a cashier/food server.[2] (Tr. at 30, Finding No. 6). The ALJ considered the fact that (1) Claimant was 29 years old on the alleged disability onset date, defined as a younger individual aged 18-49 years old, and (2) that she had at least a high school education and could communicate in English in concluding that transferability of job skills was not material to the determination of disability.[3] (Tr. at 30-31, Finding Nos. 7-9).

Based on the testimony of the vocational expert (hereinafter "VE"), the ALJ found that Claimant could make a successful adjustment to other work that exists in significant numbers in the national and regional economy. (Tr. at 31, Finding No. 10). The VE testified that at the "light" level, Claimant could perform jobs such as an unskilled clerical worker, a kiosk cashier, or a laundry folder/sorter/bagger and at the "sedentary" level, she could perform jobs such as a non-emergency dispatcher, a product grader/sorter/selector, or an unskilled clerical worker. (*Id.*)

---

[2] The vocational expert testified that an individual with Claimant's RFC could perform her past relevant work as a cook/dishwasher. However, the ALJ afforded Claimant the "benefit of the doubt" and found that she could not perform her past relevant work given the limitations of her RFC. (Tr. at 30, Finding No. 6).

[3] The Medical-Vocational Rules supported a finding that Claimant was not disabled regardless of whether he had transferable job skills.

### III.  Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.  In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision."  *Blalock,* 483 F.2d at 775.

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

### IV.  Claimant's Background

Claimant was born in 1973 and was 34 years old on the dates of her administrative hearings. (Tr. at 45 and 80). She graduated from high school when she was 20 years old. (Tr. at 45). She repeated the first and third grades and "quit school" in the ninth grade, but "went back and finished." (*Id.*) She was in special

education/learning disability classes for most of her subjects beginning in the eighth grade and continuing until she graduated from high school. (Tr. at 46). She completed one semester of college courses, majoring in psychology, but she "quit" because she was "having a hard time" with her "learning disability." (Tr. at 72). Claimant smokes one and a half packs to two packs of cigarettes per day and has smoked since she was 11 years old. (Tr. at 81).

The most recent employment that Claimant held for a significant period of time was as a Certified Nursing Assistant (hereinafter "CNA") at a nursing and rehabilitation center. (Tr. at 47). Prior to that position, she worked in another nursing home, a fast food restaurant, a "mini mart," and a drive-through window of a restaurant. (Tr. at 47-48). She was fired from her position at the "mini mart" for receiving help from others in performing her duties at "closing time" and she quit her position at the fast food restaurant because she "didn't like it." (Tr. at 48 and 71). A "couple years," after she was fired from the mini-mart, she began working as a CNA at the nursing home mentioned above. (Tr. at 49). She took classes to earn her CNA certification, which she received in approximately 2000. (*Id.*). Claimant injured her left shoulder and neck while performing her duties as a CNA. (Tr. at 58). Claimant attempted to work for a few weeks as a waitress at a restaurant shortly before her initial administrative hearing because she was "bored at home," but she "paid for it every single day" because of problems with her left arm. (Tr. at 71).

## V.   <u>**Relevant Medical Records**</u>

The Court has reviewed the record in its entirety and will briefly summarize the pertinent evidence below. Although some of the records pre-date Claimant's

alleged onset of disability, they are relevant to establish her intellectual abilities and medical background.

### A. School Records

On February 17, 1983, when Claimant was in the third grade, her elementary school counselor, Debra S. Anderson, referred Claimant to the school psychologist, Mary Ann Sullenberger, M.S., for a psychological evaluation due to her difficulties in the subjects of reading, mathematics, and spelling. (Tr. at 291). Ms. Sullenberger administered a Wechsler Intelligence Scale for Children-Revised (hereinafter "WISC-R") test on which Claimant received a verbal intelligence quotient (hereinafter "IQ") score of 87, a performance IQ score of 80, and a full scale IQ score of 82. (*Id.*)  In her report dated February 21, 1983, Ms. Sullenberger stated that the results of the WISC-R test indicated that Claimant was functioning within the low average range of intelligence. (Tr. at 292). Her strengths were an average level of ability in general knowledge, abstract thinking, word knowledge, common sense reasoning, visual memory, and psycho-motor speed. (*Id.*) Her below average weaknesses were arithmetic reasoning, attention and concentration via auditory memory, social intelligence, visual perception, and spatial relationships. (*Id.*) On February 25, 1983, Claimant's multi-disciplinary team held a meeting to consider Claimant's educational needs and recommended that she be considered for placement in the Learning Disabilities Itinerant Program on a trial, diagnostic basis and in conjunction with continued special services in reading, math, and speech therapy as needed. (Tr. at 294).

On May 17, 1988, when Claimant was in the seventh grade, she was referred to licensed psychologist Sheila Emerson Kelly, M.A., for a psychological evaluation

due to continuing academic difficulties. (Tr. at 279). The report states that Claimant was discharged from special education classes in the sixth grade and that according to Claimant, her grades were very poor, although she "brought them all up" during the last grading period. (*Id.*) Ms. Emerson stated that Claimant was "obviously having difficulty in the regular classroom format." (*Id.*) On a WISC-R test, Claimant received a verbal IQ score of 82, a performance IQ score of 86, and a full scale IQ score of 83. (Tr. at 280). Ms. Emerson stated that these scores placed Claimant within the low average range of intellectual functioning. (*Id.*) Claimant was also given a Bender Visual Motor Gestalt Test, which showed evidence of some perceptual to motor processing difficulty. (*Id.*) Finally, Claimant was given a Woodcock Johnson Psychoeducational Battery, which indicated that she had the most difficulty in the area of the written language, but that she was within the moderately deficient range in all of the other areas. (Tr. at 280-281). Ms. Emerson stated that the Placement Advisory Committee would evaluate whether her scores met the eligibility criteria for the Learning Disabilities Program. (Tr. at 281). Ms. Emerson further concluded that in most cases, Claimant's achievement appeared to be consistent with her abilities, but that on the other hand, she was obviously having some difficult functioning in the regular classroom without assistance. (*Id.*)

On September 13, 1991, when Claimant was 18 years old and in the tenth grade, she was referred to consultant school psychologist Debra Bennett Eddy, M.A., for a triennial psychological evaluation. (Tr. at 301). Ms. Eddy administered a Wechsler Adult Intelligence Scale-Revised (hereinafter "WAIS-R") test. (*Id.*) Claimant was concerned that she would no longer qualify for special education services and that if she was required to take regular education classes, she would

fail all of her classes and not graduate. (*Id.*) Claimant was cooperative during testing and the results were considered to be valid. (*Id.*) Claimant received a verbal IQ score of 80, a performance IQ score of 82, and a full scale IQ score of 79 +/-3. (*Id.*) Ms. Eddy stated that Claimant's overall level of intellectual functioning fell in the low average range of ability; that she was very strong in her ability to work persistently and quickly; and that she would benefit from counseling regarding future career options. (Tr. at 302).

### B. Pre-onset Records

On October 31, 2000, Claimant consulted with Robert G. Tayendco, M.D. for the first time, complaining of fever and nasal congestion. (Tr. at 379). Dr. Tayendco assessed that Claimant had partially treated acute sinusitis and advised her cut down and eventually quit smoking cigarettes. (*Id.*) Claimant returned the next day, complaining that she felt dizzy and unstable when standing up and was having increased headaches. (Tr. at 378).  On December 6, 2000, Claimant again saw Dr. Tayendco for upper respiratory tract symptoms, which was assessed as acute sinusitis, noting that Claimant was a smoker. (Tr. at 377).

On January 6, 2001, Claimant was evaluated by an emergency room nurse at Pleasant Valley Hospital for migraines, which she described as the worst that she ever experienced. (Tr. at 312). She was administered Demerol, Phenergan, and Tordol and was discharged once she reported that her headache felt better and that she felt "high." (*Id.*) On January 9, 2001, Claimant followed-up with Dr. Tayendco, complaining that she still had headache even after being treated in the emergency room. (Tr. at 376). Dr. Tayendco planned to order a CT scan for the following week if her headache did not subside. (*Id.*)

On January 18, 2001, Dr. Tayengco ordered a CT scan of Claimant's head at Pleasant Valley Hospital due to "occipital/frontal headaches, new onset, very severe." (Tr. at 385). Dr. Agrawal reported that the results of the examination were unremarkable and prominence cistern magna was suggested, but that finding was incidental and most likely without significance. (*Id.*)

On January 30, 2001, Claimant followed up with Dr. Tayendco, stating that she still had the headache, which she rated as ranging from a "3" when she woke up in the mornings to a "9" at mid-day. (Tr. at 375). Dr. Tayendco assessed that her headaches were probably migraines, contrary to his prior assessment that they were stress-related, because she experienced the headaches on days that she was not under stress. (*Id.*) On February 7, 2001, Claimant followed up with Dr. Tayendco regarding her ear pain and headaches. (Tr. at 374).

On February 27, 2001, Claimant came to the Pleasant Valley Hospital Emergency Room, stating that while at work, she was lifting a resident and she "pulled something" in her neck/back/left arm. (Tr. at 538). She rated her pain as "8" on a scale of "0" through "10." (Tr. at 540)

On March 6, 2001, Claimant returned to the Pleasant Valley Hospital Emergency Room, stating that while at work, she ran over her foot with a wheelchair when pulling a nursing home resident through a door. (Tr. at 534). She rated her pain as "10" on a scale of "0" through "10." (*Id.*) An x-ray of her right foot demonstrated no abnormality of bony alignment or architecture. (Tr. at 537).

On June 9, 2001, Claimant was seen in the emergency room at Pleasant Valley Hospital, complaining that while working at the Nursing Care Center, she lifted a patient and developed pain in her left arm, numbness in the fourth and

fifth fingers of her left hand, and swelling around her left elbow. (Tr. at 308). The physical examination indicated that she was in minimal distress. (*Id.*) She was diagnosed with a left elbow strain with ulnar neuropathy for which an Ace wrap was applied; she was prescribed Wygesic #20 for pain; she was restricted from work for four days; she was ordered to follow up with her family doctor; and she was ordered to do no heavy lifting. (Tr. at 309).

On September 8, 2001, Claimant came to the Pleasant Valley Hospital Emergency Room complaining that she injured her right shoulder at work when lifting a patient from the bed to a chair, rating her pain a "10" on a scale of "0" through "10." (Tr. at 486).

On September 25, 2001, Claimant was seen in the emergency room at Pleasant Valley Hospital, complaining of vomiting and chills, which she rated a "6" on a scale of "0" through "10." (Tr. at 481). She was diagnosed with gastroenteritis and sinusitis. (Tr. at 485).

On November 30, 2001, Claimant presented to the Pleasant Valley Hospital Emergency Room complaining of left shoulder pain, rating her pain a "9" on a scale of "0" through "10." (Tr. at 177). She reported that she was "lifting a patient at 11:30" and "started having pain [at] 12:30." (Tr. at 178). She also reported pain in her left ribs under her Axilla, but an x-ray showed no fracture and no abnormalities. (Tr. at 480). At 2:45 p.m., she stated that she felt better. (Tr. at 178).

On January 25, 2002, Claimant followed up with Dr. Tayendco, complaining of increased congestion, shortness of breath, and anxiety. (Tr. at 371).

On January 29, 2002, Claimant came to the Pleasant Valley Hospital Emergency Room, stating that she injured her left shoulder approximately an hour prior while lifting a nursing home resident at work. (Tr. at 559). She rated her pain a "9" on a scale of "0" through "10." (*Id.*)

On March 27, 2002 Claimant was seen in the emergency room at Pleasant Valley Hospital for sinus congestion and cough. (Tr. at 304). She was diagnosed with acute bronchitis and sinusitis. (*Id.*) The record indicates that her current medications were Paxil and Xanax. (*Id.*)

On April 23, 2002, Claimant came to the Pleasant Valley Hospital Emergency Room, complaining of a headache, fever, aches, and lightheadedness. (Tr. at 549). She rated her pain a "10" on a scale of "0" through "10." (*Id.*)

On April 30, 2002, Claimant was seen by Dr. Tayendco, complaining of right ear pain, a sore throat, and a low-grade fever, which was assessed as acute sinusitis partially treated on Amoxil. (Tr. at 370).

### C. Post-onset Records

On May 15, 2002, Claimant presented to the Pleasant Valley Hospital Emergency Room, complaining of left shoulder pain that she rated a "10" on a scale of "0" through "10." (Tr. at 544). She reported that she was assisting a client in and out of a van when the client lost her balance and Claimant was injured catching her fall. (Tr. at 547). She complained of left shoulder pain radiating into the left side of her neck and down her left arm. (*Id.*) There was some soft tissue tenderness anteriorly and posteriorly in the rotator cuff area of the shoulder, as well as some muscle spasms of the cervical erector spinae on the left, but no bony tenderness of the neck, shoulder, or arm. (*Id.*) She was diagnosed with an acute

left shoulder and cervical strain. (*Id.*)  On the same date, Claimant's cervical spine and left shoulder were x-rayed at Pleasant Valley Hospital to evaluate her neck and shoulder pain. (Tr. at 384). The results showed that her left shoulder was not fractured or dislocated and her cervical spine had no bone or joint abnormality and was a normal study. (*Id.*)

On May 20, 2002, Robert W. McCleary, D.O., noted that Claimant was exquisitely tender over the anterior later aspect of her shoulder; she had pain with the drop-arm test, but it was negative; she had 4/5 muscular strength; she had a positive impingement sign; neurovascularly she was intact; and x-ray examination showed no evidence of fracture or acromioclavicular joint separation. (Tr. at 424).

On June 4, 2002, a MRI was taken of Claimant's left shoulder because of "trauma with pain." (Tr. at  543). The linear signal present in the supraspinatus tendon had characteristics of chronic tendonitis as opposed to an acute tear. (*Id.*) The presence of fluid just beneath the acromion possibly reflected a bursitis in the region. (*Id.*)

On June 11, 2002, Dr. McCleary noted that Claimant began complaining of numbness and tingling in her left arm in addition to pain. (Tr. at 423). She still had a mild impingement sign, but it was not as progressive at it was previously. (*Id.*) An MRI of Claimant's cervical spine taken on June 27, 2002 at Pleasant Valley Hospital was negative. (Tr. at  542).

On July 2, 2002, Dr. McCleary noted that Claimant complained during a follow-up appointment of numbness, headaches, and tingling. (Tr. at 422). Her MRI was "essentially negative with no HNP or herniated discs or any cord compression" and she was intact neurovascularly, she had 5/5 strength, she was

negative for Clonus or Babinski, and she had a negative spurling sign. (*Id.*)

On August 15, 2002, Dr. McCleary stated that Claimant had "positive Tinel's over the ulnar aspect" and "pain over the supraspinatus and trapezius region." (Tr. at 421). The MRI of her shoulder and neck were negative for disc disease. The MRI of her shoulder showed impingement with no frank tear. Claimant felt "pretty good" and had "5/5 muscular strength." (*Id.*)

On September 10, 2002, Dr. McCleary noted that Claimant had spasms of the supraspinatus and trapezius region and pain with traction. (Tr. at 420). An electromyography (EMG) showed no evidence of ulnar nerve palsy, but did show C7 radiculopathy on the left. (*Id.*) She still complained of left arm pain. (*Id.*) A MRI of her cervical spine was negative. (*Id.*) She had some mild impingement of the shoulder, but it was minimal at best. (*Id.*) Dr. McCleary felt it was a cervical nerve root injury and wondered if manipulation may help "calm the muscle down." (*Id.*) He said "[s]he is going to come back and see if we can give her some light duty." (*Id.*)

On December 19, 2002, Dr. McCleary noted that Claimant had "not really improved at all." (Tr. at 419). He planned to put her on light duty or if that was not possible, to put her on full duty on a trial basis and then return her to light duty. (*Id.*)

On January 28, 2003, Dr. McCleary noted that Claimant had a positive EMG showing a C7 radiculopathy, but her MRI was negative. (Tr. at 418). She stated that she was in an exquisite amount of pain and had not improved. (*Id.*) Dr. McCleary thought she was worsening to the point where she could not work, stating "[w]e tried to keep her working but the pain has become too unbearable"

and further stating that the pain was persistent and had not improved with therapy. (*Id.*)

On March 13, 2003 Claimant was evaluated by Doug James, physical therapist and board certified specialist in orthopedic physical therapy, at Oasis Multidisciplinary Based Rehabilitation Services (hereinafter "Oasis"). (Tr. at 338-341). Claimant complained of headaches, left side numbness in her head, and intermittent left upper extremity weakness and paresthesias. (Tr. at 338). Claimant stated that she would like to return to work as a CNA with her previous employer, if possible. (Tr. at 339). Her strength classification, based on her performance during testing, was "light." (*Id.*) Mr. James found that Claimant was a good candidate for rehabilitation and stated that one of the goals was to increase her physical demand level to "medium." (Tr. at 340).

On the same date, Claimant was evaluated by Kellee Abner, M.D., at Oasis. Claimant reported that on May 15, 2002, she was lifting a patient at Pleasant Valley Hospital where she was employed as a nurse's aide when the patient fell on Claimant, and the full impact of the fall was felt in her left shoulder. (Tr. at 335). Claimant stated that the initial pain in her left shoulder shifted to her left neck in the region at the base of her skull and at times, she experienced tension-type headaches. (*Id.*) She returned to work on modified duty for 120 days, but when no light duty assignment was available, she was "taken off work." (*Id.*) Her current medications included Vicodin, as needed; Motrin 800 mg three times a day, as needed; and an over-the-counter sinus medication. (*Id.*) She was assessed as having neck pain status post cervical sprain/strain; left shoulder pain—improved; possible neuropathic pain; and a newly-discovered right breast lump for follow-up.

(Tr. at 337). Dr. Abner thought anticonvulsants might help the neuropathic component of her disorder, but otherwise, Claimant should continue taking Motrin as needed to alleviate her pain. (*Id.*)

Later that day, Claimant was evaluated by a licensed psychologist at Oasis, Gale Thompson, M.A. (Tr. at 331-334). Claimant related that she was injured when she attempted to catch a patient who fell while walking up the stairs.  The patient landed on her left shoulder. (Tr. at 331). She stated that she heard a popping sound and felt immediate pain in her neck; she went to the emergency room at Pleasant Valley Hospital where x-rays were negative; she was referred to Dr. McCleary who treated her conservatively with medications; she was referred for physical therapy, but was unable to tolerate the exercises; she received spinal manipulation; she returned to work in September 2002 and worked until December 8, 2002 when the pain became intolerable; Dr. McCleary took her off work and referred her to Oasis for evaluation and possible treatment. (Tr. at 331). Ms. Thompson stated that from a psychological standpoint, Claimant presented moderate levels of depression secondary to pain and physical limitations; her sleep was fragmented, her socialization diminished, her appetite waned, and her daily functioning was moderately impaired. (Tr. at 333). She appeared motivated to return to gainful employment; she attempted to return to work, but was unable to tolerate the demands of the job; although she wanted to return to work in some capacity, she was uncertain if she could tolerate the heavy tasks required of a nursing assistant. (*Id.*)  After a month in the Oasis program, Claimant reported that she was "making some progress." (Tr. at 326). However, on April 29, 2003, Dr. Abner noted no significant changes in Claimant's condition. (Tr. at 324-325).

On May 16, 2003, Dr. McCleary noted that Claimant was still exquisitely tender over the left scapular region and that she had gotten a lot stronger, but still had the exquisite headaches, tension, and trigger points in that region. (Tr. at 417). On the same date, Claimant complained of progressive problems with headaches and left arm weakness. (Tr. at 322). She stated that her headaches began in her left shoulder, radiated to her occiput, and then to the top of her head above her eyes. (*Id.*) Her chiropractic manipulations, which seemed to "loosen things up" toward alleviating her headaches, ended the prior month because Worker's Compensations ceased approving them and she had no specific pain management since then. (*Id.*)

On July 31, 2003, Claimant was seen by Francis M. Saldanha, M.D., at Day Surgery Center. (Tr. at 346-348). Her chief complaint was chronic pain in her "left posterior cervical compartment, left shoulder girdle." (Tr. at 346). Her MRI revealed no disc herniation and was essentially negative. (*Id.*) Her EMG suggested C7 radiculopathy on the left side. She was given trigger point injections by Dr. McCleary, but did not receive a whole lot of benefit. (*Id.*) Excessive stress, lifting, and cold/damp weather changes aggravated her pain and there were apparently no alleviating factors. (*Id.*) Her current medication was Vicodin, prescribed by Dr. McCleary.  (*Id.*) She was diagnosed with chronic cervical strain with questionable radiculopathy as seen on the EMG report involving C7 on the left side. (Tr. at 348). Dr. Saldanha recommended two sessions of cervical facet joint injections and two sessions of trigger point injections. (*Id.*)

On September 5, 2003, Dr. Saldanha gave Claimant cervical facet joint injections on her left side. (Tr. at 345). On September 19, 2003, Dr. Saldanha gave

her trigger point injections, noting that when Claimant completed her remaining sessions, Dr. Saldanha was strongly in favor of rating her as having reached MMI (maximum medical improvement) and recommended that she then receive two to four weeks of work conditioning and be allowed to return to work, perhaps at modified duty for a month or two before returning to regular duty. (Tr. at 344). Dr. Saldanha discussed with Claimant that she needed to wean herself off of narcotics and that he recommended the use of Tylenol to control her musculo-skeletal pain and to use Vicodin on an occasional basis. (*Id.*)

On September 26, 2003, West Virginia Workers' Compensation referred Claimant to Paul W. Craig, II, M.D., C.I.M.E. (Certified Independent Medical Examiner), who was board certified in Occupational Medicine, for an independent medical evaluation (IME). (Tr. at 349-356). In his report dated October 11, 2003, Dr. Craig listed his final diagnoses/findings as the following:

1. Acute musculoligamentous cervical strain and left shoulder strain with trapezial muscle involvement.
2. Possible nerve root/brachial plexus stretch injury with ongoing radiculitis, possibly at the C7 nerve root.
3. No discogenic injuries or vertebral fractures were noted on the diagnostic studies completed including MRI and x-ray.
4. Persistent musculoligamentous discomfort with secondary moderate musculoskeletal headaches.
5. Sleep cycle disturbance with mild secondary depressive symptoms with no overt findings of a depressive disorder at this time, but this could in fact develop and intervention may be required. Efforts to control her sleep cycle disturbance may abort any clinical depressive sequelae. This is directly related to her compensable injury.
6. Minimal progress has been made overall, so far, as far as helping to alleviate her level of discomfort, although her treatment to date has clearly been appropriate. She has had a protracted absence from work despite attempts to return to work. No symptom exaggeration was present on today's evaluation.
7. The opportunity for more complete pharmacologic intervention is present.

8. The examinee remains temporarily and totally disabled at this time.
9. Tobacco abuse.
10. The examinee also appears to have some primary shoulder problems with mild impingement and possible subacromial bursitis.

(Tr. at 350). Dr. Craig found that Claimant had not yet reached maximum medical improvement, but that her prognosis was fair to good. (Tr. at 350 and 351).

On September 30, 2003, Dr. McCleary noted that Claimant still had left upper extremity radiculopathy with pain, was exquisitely tender over that region, and had numbness and tingling in the C7 and C8 dermatomal region. (Tr. at 416).

On October 14, 2003, Claimant was seen by Dr. Tayendco, complaining of depression, stating that her blood pressure would rise when she became nervous, and stating that her stepfather died and she was extremely anxious. (Tr. at 369).

On November 19, 2003, Roger C. Baisas, M.D., from WV Neuro Spine Stroke Center completed an independent medical evaluation (IME) to assess her Workers' Compensation claim. (Tr. at 607-624). Dr. Baisas accepted/approved Claimant's diagnoses of a 840.9 sprain/strain of her shoulder and upper arm in an unspecified site and a 847.0 sprain/strain of her cervical spine. (Tr. at 620).  He also noted an intercurrent diagnosis of 723.4 cervical radiculitis, based on chief complaints, history, symptomatology, and diagnostic test results. (*Id.*)  He did not note any co-morbities not resulting from her injury, nor any pre-existing medical conditions that occurred prior to her injury in the area affected by the injury. (*Id.*) He rated her prognosis as fair, noting that her impairment was not progressive. (*Id.*)  Dr. Baisas believed Claimant had reached maximum medical improvement in connection with her cervical spine and left shoulder; she was not a surgical

candidate for any kind of invasive intervention and had enough physical therapy and pain management. (Tr. at 620-621). He felt that Claimant qualified for 13 percent total whole person impairment on the cervical spine and left shoulder. (Tr. at 623). He noted that she had "a job to return to," but that her employer could not accommodate a position with restrictions on frequent bending and lifting; therefore, he suggested a functional capacity evaluation along with a rehabilitation assessment. (Tr. at 623-624).

On January 15, 2004, a MRI of Claimant's cervical spine taken at Pleasant Valley Hospital suggested minimal early degenerative disc bulging at C4 through C7, but no disc herniation or spinal stenosis. (Tr. at 576). The results suggested a "generally unremarkable examination." (*Id.*)

On February 2, 2004, Claimant reported to Dr. Tayendco that she had been anxious and depressed since the death of her stepfather. (Tr. at 368).

On April 22, 2004, Dr. McCleary noted that Claimant was intact neurovascularly, but still had some tenderness and spasms of the cervical spine in her left shoulder. (Tr. at 415). He evaluated that she had the functional capacity to perform "medium" to "light" activity. (*Id.*) He also noted that he felt that she was "disabled from the type of work that she was doing" and needed to find a different type of job. (*Id.*)

On June 17, 2004, Dr. McCleary referred Claimant to Larry V. Carson, M.D., and Rolando Garcia, Certified Physician's Assistant, of the West Virginia University Department of Neurosurgery. (Tr. at 357-358). Dr. Carson and Mr. Garcia found that no surgery was strongly indicated for Claimant at that time. (Tr. at 358). They recommended that she continue physical therapy and if she did not

experience relief, to consider a pain management clinic. (*Id.*)

On October 7, 2004, Dr. McCleary noted that Claimant continued to have headaches and neck pain and also developed some periodic numbness and tingling in her fourth and fifth digits. (Tr. at 414).

On November 10, 2004, Claimant was seen by Dr. Tayendco; her chief complaint was anxiety. (Tr. at 367).

On January 4, 2005, Claimant came to the Pleasant Valley Emergency Room complaining of having a headache for a week and a sore throat for the past two or three days. (Tr. at 538 and 586). She rated her pain a "10" on a scale of "0" through "10." (Tr. at 583). She was diagnosed with acute pharyngitis. (Tr. at 586).

On January 6, 2005, Dr. McCleary noted that Claimant still complained of neck and arm pain and numbness. (Tr. at 413). She had a positive EMG with a C7 radiculopathy on the left side in the past and she needed an updated EMG. (*Id.*) Dr. McCleary recommended spinal decompression for the cervical spine and a new EMG. (*Id.*)

On March 4, 2005, Dr. McCleary noted that Claimant's EMG results were negative. (Tr. at 412). Claimant still complained of a trapezius spasm and pain. (*Id.*) Dr. McCleary thought massage therapy might be helpful. (*Id.*)

On June 30, 2005, Dr. McCleary noted that Claimant still complained of neck pain, but that it was not as severe as it had been; that her headaches were fairly persistent; and that she attempted to work as a waitress, but could not tolerate it at all. (Tr. at 411). Neurovascularly, she was intact; she was tender over the C5/C6 C7/C8 spinous processes; she still had pain down her left arm; her recent EMG was negative; and she had 4/5 strength. (*Id.*) His assessment was a

sprain/strain of her neck and shoulder and degenerative disc disease at C5/C6 C7/C8. (*Id.*) His treatment plan included Accu-Spina treatments, pain management, Lortab and Xanax, and a follow-up visit in three months. (*Id.*)

On September 30, 2005, Claimant reported to Dr. Tayendco; her chief complaint was anxiety, stating that since her mother moved to Alaska, she was more anxious and had more arthritic symptoms. (Tr. at 366). On the same date, Dr. McCleary noted that Claimant still had "pain in the neck and shoulder with left arm radiculopathy, numbness, and tingling," as well as "persistent headaches from her injury." (Tr. at 468). Neurovascularly, she was intact and her strength was 4/5 in the left upper extremity deltoid region. (*Id.*) Dr. McCleary recommended manipulations and massage for some motional releasing, as well as her medications. (*Id.*)

On November 22, 2005, Catherine Van Verth Sayre, M.A., a psychologist at Prestera Center, assessed Claimant's mental status, noting that in terms of social functioning, Claimant participated in school functions with her son and stepson and spent time with a good friend and that her daily activities consisted of housekeeping, cooking, laundry, and running errands. (Tr. at 96). Ms. Van Verth Sayre diagnosed Claimant with depressive disorder not otherwise specified and a history of a learning disorder not otherwise specified. (*Id.*) Claimant's prognosis was "good." (*Id.*)

On November 28, 2005, anteroposterior and lateral projections were taken of Claimant's cervical spine to assess the source of her neck pain. (Tr. at 404). James Carrico, M.D., noted that the two views revealed no appreciable degenerative changes, no acute fracture, and no alignment abnormality; his

impression was that there were no significant findings. (*Id.*)

On November 30, 2005, Claimant came to the Pleasant Valley Emergency Room, complaining that she had a headache for four days, as well as chills, aches, and a runny nose. (Tr. at 579). She rated her pain a "10" on a scale of "0" through "10." (*Id.*) She was diagnosed with acute pharyngitis/sinusitis and cephalgia. (*Id.*)

On December 4, 2005, Claimant was referred by the West Virginia Department of Disability Services (hereinafter "DDS") for a consultative examination by Kip Beard, M.D., of Tri-State Occupational Medicine. (Tr. at 397-400). Dr. Beard summarized that his examination revealed some motion abnormalities with pain and tenderness and some sensation loss of the left hand, which seemed nonspecific; there was no weakness or atrophy; her reflexes appeared symmetric; there were no findings of a well-defined radiculopathy or that of myelopathy; her gait was normal; and she required no ambulatory aids and her manipulation was well preserved. (Tr. at 400).

On December 12, 2005, Dr. McCleary completed a routine abstract form assessing Claimant's physical abilities, noting normal findings with the exception of Claimant's grip strength of 4/5 in her left hand, limited range of motion in her neck, and radiculopathy and sensory deficits in her upper left extremity. (Tr. at 406-410). Dr. McCleary did not note the extent of these limitations. He diagnosed Claimant with a strain/sprain of her neck and shoulder. (Tr. at 409). Her current medications were Xanax and Lortab. (*Id.*)

On December 23, 2005, A. Rafael Gomez, M.D., completed a physical RFC assessment of Claimant's current condition, noting the following:

- Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit with normal breaks for about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry.

- Claimant could frequently climb ramps/stairs, balance, stoop, kneel, and crouch, but she could only occasionally crawl and never climb ladders/ropes/scaffolds.

- Claimant was mildly limited in the ability to reach in all directions due to pain in her neck and left shoulder and mild weakness in her left arm, but she had no limitation in gross and fine manipulation and feeling through her skin receptors.

- Claimant had no visual or communicative limitations.

- Claimant should avoid concentrated exposure to vibration and hazards.

(Tr. at 426-429). Dr. Gomez reviewed Claimant's numerous reported activities of daily living and the pain that she alleged and concluded that Claimant was "not fully credible." (Tr. at 430). He found that her symptoms were "out of proportion to the physical findings." (*Id.*) She injured her neck lifting a patient and claimed to have chronic pain with decreased range of motion and pain in the left shoulder; the MRI showed degenerative disc disease of the cervical spine, but no disc herniation; she reported weakness in her left arm, but the neurological findings including motor power of the upper extremities showed that they were intact. (*Id.*) Dr. Gomez noted that Claimant was reduced to "light" work. (*Id.*) A treating/examining source statement was not in the file. (Tr. at 431).

The following day, another DDS medical consultant, Robert Solomon, completed a psychiatric review technique, finding that Claimant had a non-severe depressive disorder not otherwise specified which rendered her mildly impaired in maintaining concentration, persistence, or pace, but did not restrict her in

activities of daily living, social functioning and she had no episodes of decompensation. (Tr. at 436 and 443).

On January 17, 2006, Dr. McCleary noted that Claimant was having more pain in the left arm, as she developed "a little bit of nontraumatic tennis elbow," which she believed to be from overuse. (Tr. at 455). He recommended massage therapy, Accu-Spina treatments, and osteopathic manipulation, as well as her medication. (*Id.*)

On March 1, 2006, Claimant came to the Pleasant Valley Hospital Emergency Room, complaining that she had a "hot feeling" and was "flushed" and "itching." (Tr. at 590).

On March 14, 2006, Dr. McCleary completed a routine physical abstract form, noting no problems other than that Claimant's grip strength in her left hand was only 4/5, she had limited range of motion in her neck, and she had some reflexive and sensory issues in her upper left extremity. (Tr. at 451-452). Approximately two weeks later, Dr. McCleary stated that Claimant was in an "extreme amount of pain in the upper extremity of the left arm," as well as experiencing tenderness over the area and numbness in the fourth and fifth digits, and that she had 4/5 strength and decreased range of motion of her neck and shoulder. (Tr. at 467). He found that she was "really unable to do any activities with that arm" or "sit or stand for long periods of time," opining that she was "unable to have any gainful employment so this is probably going to be a permanent entity unless she has treatment approved by Workers' Comp." (*Id.*)

On May 1, 2006, Marcel Lambrechts, M.D., completed a physical RFC form, noting the same exertional limitations that Dr. Gomez noted in his 2005

assessment, but finding slightly more severe postural, manipulative, and environmental limitations, as summarized below:

- Claimant could occasionally climb ramps/stairs, balance, stoop, kneel, and crouch, but she should never climb ladders/ropes/scaffolds or crawl.

- Claimant is limited in reaching in all directions and gross manipulation due to neck pain and x-ray evidence of degenerative disc disease at C5 to C7. The pain goes down her left arm and hand and she has mild decreased grip rated 4/5. She also has decreased reach up and away on that side.

- Claimant should avoid concentrated exposure to extreme cold, fumes/odors/gases/poor ventilation, and hazards.

(Tr. at 458-460). Dr. Lambrechts stated that her "symptoms seem partially credible and do not appear as severe as she claims," that she was slightly restricted in the left upper extremity, and that her overall impairment was not at "listing level." (Tr. at 461). A treating/examining source statement was not in the file. (Tr. at 463).

On May 5, 2006, Timothy Saar, Ph.D., reviewed all of the evidence in the file and affirmed the December 24, 2005 psychiatric review technique. (Tr. at 464).

On June 29, 2006, Dr. McCleary noted that Claimant still had cervical pain and left shoulder pain. (Tr. at 466). He recommended pain management, an updated EMG of her upper left extremity, physical therapy, and medication. *Id.* He stated that she "continues to be disabled." (*Id.*)

On September 5, 2006, Dr. McCleary completed a physical RFC assessment, finding that on a sustained or continual basis throughout a 6 to 8 workday, Claimant could lift/carry less than 10 pounds, stand/walk less than 2 hours,  sit for

2 to 4 hours, and could not push and/or pull to operate hand and/or foot controls. (Tr. at 471-472). Claimant could not perform her past work and was capable of performing less than a full range of sedentary work. (Tr. at 472). She could never climb, balance, stoop, kneel, crouch, or crawl. (*Id.*) She could occasionally perform fine manipulation, feel, see, hear, speak, and drive a car. (Tr. at 473). She could not work in temperature extremes or where she would have to relate to co-workers and supervisors or move machinery. (*Id.*) Dr. McCleary noted that his RFC assessment was based on his diagnosis of a moderate neck strain/sprain. (*Id.*)

On October 2, 2006, Dr. Tayengco noted that Claimant's chief complaint was neck pain, stating that she had diffused joint pain. (Tr. at 598). She was assessed as having COPD, smoking a pack a day, hyperlipidemia, and joint pain. (*Id.*)

On February 21, 2007, Dr. Tayengco noted that Claimant's chief complaint was a cough, stating that she had a runny nose, cough, and nasal congestion for many months and she had increased sneezing over the past few days. (Tr. at 597). She was assessed as having allergic rhinitis. (*Id.*)

On March 19, 2007, Dr. Tayengco noted that Claimant's chief complaint was hip pain. (Tr. at  596). She stated that she had "low back pain radiating to both hips and some left elbow pain." (*Id.*) She was also "significantly anxious." (*Id.*) Dr. Tayengco assessed that Claimant had a lumbosacral strain, left elbow tendonitis, depression, and generalized anxiety. (*Id.*)  The following day, Claimant complained of left shoulder pain. (Tr. at  595). An x-ray of her left shoulder showed no fracture of dislocation. (*Id.*)

On August 6, 2007, Dr. Tayengco noted that Claimant's chief complaint was joint pain in both shoulders, both elbows, in her scapula area, and in her right hip. (Tr. at 592). She denied any trauma. (*Id.*) Dr. Tayengco noted "possible fibromyalgia." (*Id.*) He also noted that her anxiety was "much better." (*Id.*)

On October 24, 2007, John J. Kampsnider, Ph.D., evaluated Claimant and completed an adult mental profile dated October 31, 2007. (Tr. at 599-603). He found that her insight, judgment, remote memory, and social functioning were mildly impaired; her concentration and recent memory moderately impaired; and her immediate memory, persistence, and pace within normal limits. (Tr. at 602). On a WAIS-III IQ, Claimant received a verbal IQ score of 75, a performance IQ score of 70, and a full scale IQ score of 71. (*Id.*) Dr. Kampsnider found that the results were valid in that Claimant appeared to understand directions, put forth a sustained effort, and appeared to work to the best of her ability under adequate testing conditions. (*Id.*) His diagnostic impressions were posttraumatic stress disorder (chronic, delayed onset), dysthymic disorder, recurrent major depressive disorder (in partial remission), generalized anxiety disorder per prior history, and borderline intellectual functioning. (Tr. at 603). Her prognosis was guarded with continued mental health treatment. (*Id.*)

On October 31, 2007, Dr. Kampsnider evaluated Claimant's ability to do work-related activities on a scale of "none," "mild," "moderate," "marked," and "extreme." (Tr. at 604-606). Based on his diagnosis of borderline intellectual functioning, he found her mildly impaired in her ability to understand, remember, carry out, and make judgments on simple instructions and moderately impaired in her ability to understand, remember, carry out, and make judgments on complex

decisions. (*Id.*)   Based on his diagnoses of posttraumatic stress disorder and chronic depression, he found her mildly impaired in interacting appropriately with the public and moderately impaired in interacting appropriately with supervisor(s) and co-workers and in responding appropriately to usual work situations and changes in a routine work setting. (Tr. at 605).

## VI.   Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision was not supported by substantial evidence.   She argues that the ALJ failed to properly articulate in his decision (1) his analysis of the factors that he was required to consider in evaluating whether Claimant met Listing 12.05 and (2) his reasoning for rejecting Dr. McCleary's RFC opinion. (Pl.'s Br. at 10-16).

In response, the Commissioner contends the ALJ properly articulated the basis for his RFC assessment, that substantial evidence supports the ALJ's finding that Claimant does not meet Listing 12.05, and that substantial evidence supports the ALJ's evaluation of Dr. McCleary's RFC assessment.   (Def.'s Br. at 12-18).

## VII.   Analysis

### A.   Listing 12.05

In her first assertion of error, Claimant argues that she was administered three IQ tests: (1) a WISC-R test administered in 1984 when she was eleven years old, (2) another WISC-R test administered in 1991 when she was eighteen years old, and (3) a Wechsler Adult Intelligence Scale III (hereinafter "WAIS-III") test administered when she was an adult in the course of developing the record for her present Social Security benefits claims. (Pl.'s Br. at 12). Claimant states that the WISC-R test is appropriate for children between the ages of 6 years old and 16

years, 11 months old. *Id.* Claimant argues that when the ALJ rejected the 2007 IQ score because it was lower than previous scores, he "clearly failed to take into consideration the fact that the WAIS-III administered by Dr. Kampsnider was appropriate to (sic) the claimant's age at the time of testing, while the [second] test performed in 1991 was not." *Id.* In addition, Claimant argues that the ALJ failed to consider that the qualifications and experience of the individuals who performed the 1984 and 1991 tests are unknown, whereas the record establishes that Dr. Kampsnider, who administered the 2007 exam, is a licensed psychologist who was chosen by the State Agency as the request of the Commissioner to administer and interpret the IQ test. (Pl.'s Br. at 13). Therefore, Claimant argues that "the ALJ inappropriately rejected the results obtained by Dr. Kampsnider without addressing whether the other standardized psychological tests, he did accept, were appropriate and were administered and interpreted properly by licensed and trained individuals as codified in the listings." *Id.* Finally, Claimant states that "[u]nder these circumstances, it would be important to re-evaluate the claimant under listing 12.05." *Id.*

At the third step of his analysis, the ALJ considered Listing 12.05 which refers to the impairment of mental retardation. Mental retardation is defined in Listing 12.05 as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As noted by the ALJ, two sections of this Listing warranted evaluation in Claimant's case. Listing 12.05C is met if a claimant has a "valid verbal, performance, or full scale IQ of 60 through 70 and a

physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Listing 12.05D is met if a claimant has "a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) Marked restriction of activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." *Id.*

On this point, the ALJ acknowledged that in November 2005, Claimant received a verbal IQ score of 75, a performance IQ score of 70, and a full scale IQ score of 71 on a WAIS-III evaluation. (Tr. at 23). Claimant's performance IQ score of 70 would potentially qualify her for either or both of the Listings discussed above, if the other requirements of the Listings were met. However, the ALJ noted that he gave her November 2007 scores little weight because they were inconsistent with her previous IQ scores, which ranged from 79 to 86, and her academic background, which includes a high school diploma and one semester of undergraduate classes at a University. (*Id.*)

In general, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, but the Commissioner is not required to accept such scores. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); See also, *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The Commissioner may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions or other record evidence

indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average I.Q. *Clark*, 141 F.3d at 1255; *Markle v. Barnhart,* 324 F.3d 182, 186 (3d Cir. 2003); *see* 20 C.F.R. § 404.1527(d)(2). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986).    The question for the Court is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole." *Poque v. Astrue,* 692 F. Supp.2d. 1088 (E.D. Mo. 2010).

It is well-settled that an individual's IQ is considered to remain relatively constant throughout her life, absent evidence of a change in a person's intelligence functioning. *See Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 668 (4th Cir. 1989). Moreover, mental retardation is generally considered a lifelong, and not acquired, disability. *See Smith v. Barnhart,* 2005 U.S. Dist. LEXIS 5975, * 10 (W.D.Va. 2005).    In this case, Claimant has received the following IQ scores:

| Exam Date | Exam Type | Verbal IQ Score | Performance IQ Score | Full Scale IQ Score |
|---|---|---|---|---|
| February 17, 1983 | WISC-R | 87 | 80 | 82 |
| May 17, 1988 | WISC-R | 82 | 86 | 83 |
| September 13, 1991 | WAIS-R | 80 | 82 | 79 +/- 3 |
| October 24, 2007 | WAIS-R | 75 | 70 | 71 |

(Tr. at 291, 280, 301, and 602). It is evident that Claimant's 2007 scores are inconsistent with her previous test scores which roughly averaged a verbal IQ score of 83, a performance IQ score of 82, and a full scale IQ score of 81. Other than Claimant's aberrant 2007 IQ scores, the record contains no evidence of a change in Claimant's intellectual abilities or an event, such as a traumatic brain injury, for example, which would explain and validate a significant decline in Claimant's intellectual ability.

Further, Claimant's 2007 scores are inconsistent with her academic and professional history in which she earned a high school diploma, albeit taking special education/learning disability classes for most of her subjects in grades eight through twelve; completing one semester of undergraduate courses, although she claims that she "quit" because of her learning disability; and successfully completing a certified nursing course, earning her nursing assistant certification, and working as a CNA for at least two years without any apparent complications related to her intellectual functioning. She repeatedly stated that she stopped working because she felt that her physical pain was intolerable in performing the duties of a CNA, defined as a medium to heavy semi-skilled position. (*See, e.g.,* Tr. at 331). However, the record does not establish that her intellectual functioning impaired her ability to work as a CNA in any way. Claimant's daily activities and social functioning are also inconsistent with someone with mental retardation. For instance, she participated in school functions with her son and stepson, spent time with her good friend, cleaned her home, cooked, did the laundry, and ran errands. (Tr. at 96).

As stated, Listing 12.05 concerns someone with "significantly subaverage" intellectual functioning. Here, Claimant was evaluated as having a "low average" range of intellectual ability on three separate IQ tests. (Tr. at 292, 280, and 302). Although Claimant clearly suffers from some learning deficits, all of the evidence before the Court indicates that Claimant does not have the degree of deficits contemplated by Listing 12.05. Claimant's performance IQ score of 70 on the November 2005 administered by Dr. Kampsnider is the sole piece of evidence that would indicate that she meets Listing 12.05. Substantial evidence supports the ALJ decision to afford little weight to Claimant's 2007 IQ scores as they are inconsistent with prior IQ tests and Claimant's activities and behavior.

Furthermore, the ALJ did discount Claimant's learning deficits. At the second step of his analysis, he found that she suffered from the severe impairment of borderline intellectual functioning with a learning disorder. (Tr. at 21, Finding No. 3). At the third step of the sequential evaluation, the ALJ thoroughly considered and documented his analysis of the "paragraph B" criteria referenced in Listing 12.05D. In applying the special technique to assess Claimant's mental impairments, the ALJ found that Claimant had a "mild" limitation in activities of daily living; "moderate" limitations in social functioning and concentration, persistence, or pace; and never experienced deterioration or decompensation in work or work-like settings. (Tr. at 23-24, Finding No. 4). Finally, the ALJ crafted a generous RFC finding, stating that Claimant functioned at the borderline IQ level and had a history of learning disorders, but functioned at least at the limited academic or educational level. (Tr. at 25, Finding No. 5). He further explained that Claimant could not perform complex tasks; that she had a "mildly limited" ability

to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, and to deal with the public; and that she had a "moderately impaired" ability to understand, remember and carry out detailed instructions, to interact with supervisors and co-workers, and to respond to usual situations and changes in a routine work setting. (*Id.*)

With regard to Claimant's argument that the ALJ did not properly articulate whether the IQ tests that he considered were the correct measure of Claimant's intellectual ability and whether they were administered by appropriate individuals, the Court finds these arguments to be without merit. Claimant is incorrect that she was administered a WISC-R test in 1991. She was in fact administered a WAIS-R test in 1991, which was the appropriate measure of her IQ at 18 years old. (Tr. at 302). Therefore, Claimant's contention that the ALJ relied upon an inappropriate IQ exam is baseless.

Further, contrary to Claimant's assertion, the ALJ was not required to discuss the qualifications of the sources of Claimant's first three IQ tests, as the sources are unequivocally documented in the record. Claimant's 1983 exam was administered by her school psychologist, Ms. Sullenberger; Ms. Sullenberger clearly indicated in her report the testing which she did not administer personally, which in this case, was the Wide Range Achievement Test (WRAT) administered by Ms. Anderson. (Tr. at 291-293). Claimant's 1988 exam was administered by Ms. Kelly, a licensed psychologist. (Tr. at 279-281). Claimant's 1991 exam was administered by Ms. Eddy, a consultant school psychologist. (Tr. at 301-302). For the purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning, acceptable medical sources are licensed or

certified psychologists, including "school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting." 20 C.F.R. § 404.1513(a)(2). There is no doubt that the aforementioned individuals were qualified to administer and interpret Claimant's IQ tests. In fact, Claimant does not appear to argue that they were unqualified, but rather argues that ALJ erred in not discussing their qualifications. This is a meritless objection.

Therefore, the Court finds that the ALJ's consideration of Listing 12.05 and his articulation of his analysis in the decision is supported by substantial evidence.

### B.    RFC Assessment

Claimant's second assertion of error argues that the ALJ did not articulate why he found Dr. McCleary's RFC assessment inconsistent with the overall medical record, nor did he explain why the opinion of the State Agency expert was consistent with the record as a whole. (Pl.'s Br. at 13-16).

Claimant's arguments are without merit. The ALJ articulated how Dr. McCleary's RFC assessment was inconsistent with the record, stating:

> The undersigned gives this opinion little weight for several reasons. To begin with, the claimant's neck and shoulder problems are not so severe as to justify the restrictive exertional limitations in Dr. McCleary's opinion. In addition, the lifting limitations are well below the amount of weight the claimant was capable of lifting one year after she injured her neck and shoulder.  Dr. McCleary opined that the claimant can only occasionally see or hear, but the evidence of record shows the claimant's vision and hearing are not substantially impaired. Finally, Dr. McCleary's (sic) is not a mental health professional, so an opinion regarding the claimant's mental limitations is beyond his area of expertise.

(Tr. at 29-30, Finding No. 5) (internal citations omitted). The ALJ further explained how the State agency expert's opinion was consistent with the record:

> The State agency medical opinion is given significant weight because it is consistent with the record as a whole. This opinion is supported by the results of a consultative medical examination performed by Dr. Kip Beard in November 2005. In addition, the claimant's physical limitations are consistent with the findings from a functional capacity evaluation performed in May 2003, which showed the claimant was functioning at the light-medium level of exertion. Additional limitations have been added to the claimant's residual functional capacity based upon testimony that she suffers constant joint pain due to fibromyalgia.

(Tr. at 30, Finding No. 5) (internal citations omitted).

The ALJ's statements are supported by substantial evidence from the record. On September 10, 2002, Dr. McCleary's notes indicate that Claimant was hoping for "light duty" at work. (Tr. at 420). On January 28, 2003, Dr. McCleary felt that Claimant was worsening to the point of being unable to work, but his assessment was based on her subjective complaints that the pain was unbearable. (Tr. at 418). On March 13, 2003, Claimant's strength classification was "light." (Tr. at 339). On the same date, Claimant stated that she returned to work on modified duty, but was "taken off work" because a light duty assignment was not available. (Tr. at 335). She also reported that she wanted to return to work, but was uncertain if she could tolerate the heavy tasks required of a CNA. (Tr. at 333). On September 5, 2003, Dr. Saldanha stated that after Claimant received her remaining trigger point sessions and two to four weeks of work conditioning, she could return to work, perhaps at modified duty for a month or two before returning to regular duty. (Tr. at 344). On April 22, 2004, Dr. McCleary evaluated that Claimant had the functional capacity to perform medium to light activity and that although he felt she was disabled from her previous job as a CNA, she could find a different type of job. (Tr. at 415). On December 23, 2005, Dr. Gomez found

Claimant capable of performing "light" work. (Tr. at 430). On May 1, 2006, Dr. Lambrechts noted the same exertional limitations as Dr. Gomez. (Tr. at 457). On June 29, 2006, Dr. McCleary noted that Claimant still had cervical and left shoulder pain and that she continued to be disabled. (Tr. at 466).

A review of the records briefly summarized above, as well as the rest of the records, indicates that Dr. McCleary's RFC assessment on January 17, 2006 that Claimant was capable of performing less than a full range of sedentary work (Tr. at 472) was inconsistent with some of his own findings as well as the evidence from other medical providers. In addition the evidence noted above supports the ALJ's finding that the State agency expert's finding was consistent with the record as a whole. Claimant was consistently assessed as being capable of performing "light" level work, but Dr. McCleary's assessment imposed much more severe restrictions. His treatment notes indicate that he afforded full credibility to Claimant's complaints of pain and that her subjective complaints weighed significantly on his opinions. However, Claimant's credibility regarding her pain is suspect. Prior to Claimant's 2002 injury, her medical history includes numerous emergency room visits for migraines and alleged work related injuries such as running over her foot with a wheelchair or injuring herself lifting a patient. Claimant generally rated her pain as very high on a 10-point scale, often as a "9" or "10," but x-rays, CT scans, and other testing were most often negative. (*See, e.g.*, Tr. at 312, 385, 375, 538, 540, 534, 537, and 308). Claimant clearly verbalizes her pain very strongly, which Dr. McCleary took into account, but the objective medical evidence does not support such severe limitations as those noted by Dr. McCleary in his RFC finding.

Therefore, the Court finds that the ALJ's RFC finding is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  January 26, 2011.

Cheryl A.  Eifert
United States Magistrate Judge